James Duke sues for damages for personal injuries. The defendants are Dixie Building Material Company, Inc., and its liability insurance carrier, Globe Indemnity Company. The Employers' Liability Assurance Corporation, Limited, intervenes, averring that it had issued a policy of workmen's compensation insurance to George M. Moray, the employer of Duke and, as a result, had become liable to Duke when he was injured in the accident on which this suit is based, and that it had actually paid to Duke 74 weekly payments of $14.80 each and hospital and medical expenses amounting to $250. Intervenor alleges that it might be obligated to make further payments under its policy and it asks for judgment against Duke and the two corporate defendants, decreeing that in the event there be judgment in favor of Duke, the intervenor be paid out of the first monies payable under that judgment such amounts as it might have paid or might have become liable for. *Page 823 
Duke alleges that at about 2:30 o'clock in the afternoon on June 17, 1942, while he was in the employ of George M. Moray, a contractor and was engaged in the laying of a concrete foundation for a brick wall which Moray was constructing for Fred H. Herrick on his adjacent property, the driver of a concrete mixer truck of Dixie Building Material Company, Inc., loaded with ready mixed concrete, attempted to back the truck over the curb to the sidewalk without first raising and stabilizing the chute or spoon which extended from the rear of the truck, and that this chute or spoon, which was thus permitted to swing from side to side, suddenly swung to the side on which Duke was standing and knocked him to the ground where he was thrown under the left rear wheel of the truck as it backed upon the sidewalk.
Plaintiff declares that the driver of the truck, Major Green, was careless on several counts. First and most important because, according to plaintiff, he not only failed to raise and stabilize the chute before backing the truck, second, because he backed the truck at an excessive rate of speed without looking to see if any one was in danger, and, third, in that he backed the truck against a pile of bricks and thus caused the chute to swing "violently" from side to side.
Defendants admit the occurrence of the accident but they deny that Green, the driver of the truck, was in any way at fault, and aver that he operated the truck carefully and in the customary way, and under instructions of Moray, the employer of Duke, to whom the concrete was being delivered.
In the alternative, defendants aver that plaintiff, himself, was contributorily negligent in "placing himself unnecessarily close to said backing truck" and in "voluntarily and rashly endeavoring to handle and hold the chute attached to the rear of the truck while said truck was being backed." As a further alternative defense, respondents aver that there is no liability in them under any circumstances for the reason that at the time of the occurrence of the accident Green, the driver of the truck, in following orders of Moray in pouring the concrete, had become "pro hac, vice" an employee of Moray and had thus become a fellow servant of Duke, the plaintiff; that he had stepped out of character as an employee of Dixie Building Material Company, Inc., and had become the borrowed employee of Moray. Respondents thus maintain that Duke may not recover even if Green was at fault for the reason that Green was his fellow employee; and because of the fellow servant doctrine could not recover.
In the District Court there was judgment dismissing plaintiff's suit and also dismissing the intervention of Employers Liability Assurance Corporation. Both plaintiff and that insurance company have appealed.
The special defense that the truck driver, Green, became the borrowed employee of Moray, the employer of Duke, is based on the following admitted facts. Moray, the contractor, had ordered the ready mixed concrete to be delivered on the job which he, as contractor, had undertaken to perform for Herrick. The concrete was being used as a foundation for the brick wall which he was constructing. The foundation was quite long and, consequently, Moray found it expedited his work to have the truck, which was delivering the concrete, instead of pouring it all in one place, pour a portion of it at one part of the trench in which the foundation was being built and then move and pour another portion several feet further along in the trench. The theory of defendants is that it was the obligation of the Dixie Building Material Company to deliver the concrete only at one place, and that since it was on the order of Moray and for his convenience, that Green was making delivery in different places and was assisting by pouring the concrete tinder the orders of Moray, in doing so he became "pro hac vice" an employee of Moray.
[1] The legal principle on which this defense is based is well recognized and may be applied where the facts justify it. In 39 C. J. 558, 560, § 669, the rule is stated as follows: "Servant of One Master Controlled by Another. Where one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as a servant of the man to whom he is lent, although he remains the general servant of the person who lent him; and, if the servant receives injuries in such employment, from the negligence of a servant of the person to whom he is lent, he cannot recover therefor from the person to whom he is lent. Conversely, for the negligence of such servant in the particular employment of another master, the general master is not liable. *Page 824 
The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired. Nevertheless, the servant so loaned must consent to the change of masters, expressly or impliedly; and to bring the case within the rule the services rendered by the employee for the third person must be such as to create the legal relation of master and servant. Actual exercise of the right to control the servant of the general employer in the service of a special master is not necessary where the special master is willing to rely upon the experience and skill of the loaned servant. However, the fact that the general master pays the wages of the servant does not preclude him from becoming pro hac vice the particular servant of another."
We recognized the doctrine in Spanja v. Thibodaux Boiler Works, 2 So.2d 668. The fellow servant doctrine is also well established in this state. Ever since the decision in Hubgh v. New Orleans Carrollton R. Co., 6 La. Ann. 495, 54 Am.Dec. 565, it has been a recognized defense.
We are asked to apply here the doctrine of the Spanja case and since, if applicable, it would bar a recovery by plaintiff, we shall consider this contention first.
In the Spanja case, the Thibodaux Boiler Works had contracted to make certain repairs to machinery of the Texas Company and the Boiler Works was sending its machinery and equipment to the scene at which the repairs were to he made in the marshes below the City of New Orleans. The Texas Company sent a boat to the landing from which the machinery was to be transported by the boat to the spot at which the repairs were to be made. It was the duty of the Boiler Works to transport this machinery and equipment from its place of business to the point at which the repairs were to be made and it was also the duty of that company to load that machinery and equipment upon the boat which the Texas Company had sent.
Spanja was a regular employee of the Texas Company and was employed in the operation of the boat and had nothing to do with the loading or unloading of the machinery and equipment of the Boiler Works. He undertook to assist in this work and, in helping to transfer the machinery from the dock to the boat, sustained injuries. We held that he, had become the borrowed employee of the Boiler Works since his own employer had nothing whatever to do with the transferring of that machinery from the dock to the boat; that he had stepped out of character as an employee of the Texas Company and had become the employee of the Boiler Works.
[2] Here, however, it was the duty of Green, as an employee of Dixie Building Material Company, to deliver the concrete and anything done by him in connection with that delivery was done as an employee of that company and not as a borrowed employee of the contractor, Moray. The mere fact that the contractor required Green to divide the load and to make two or more deliveries, each in a different place, did not alter the fact that in doing so the driver was merely delivering something which was being sold by his employer. We are aware of the fact that those companies which sell ready mixed concrete have largely increased their business by pointing to the convenience of having the concrete delivered in a ready-mixed condition and in having it poured directly into the hole or form into which it is to set or harden. It would not do to permit it to be said that, although when such a delivery is made and the entire load is poured into one hole or form the delivering driver remains the employee of the selling company, when the purchaser asks that the delivering truck be moved to two or more points, the driver after the first partial unloading of the truck, becomes the borrowed employee of the contractor merely because he is making the delivery a little more convenient for the contractor.
In order to reach a conclusion as to whether the driver of the truck was at fault and to consider further whether, if the driver was at fault, Duke was not himself contributorily negligent, we must study in detail the facts which brought about the accident. The trench into which the concrete was to be poured paralleled the curb of the street and was on the property line of the adjacent property. Between it and the curb there was a paved sidewalk and an unpaved strip 14 feet in width. The chute or spoon through which the concrete was to be poured from the mixing cylinder of the truck was 6 feet, 8 inches in length and, therefore, since the concrete was to be poured directly into the trench it was necessary that the truck be backed over the curb to a point not more than about 6 feet or so from the trench. *Page 825 
The truck had just poured some of its load of concrete into the trench at a point estimated at from 6 to 25 feet away from the point to which it was backed when the accident took place and this movement was being made under instructions from Moray, the contractor.
The large chute or spoon which was used to pour the concrete when it was to be delivered directly into the trench or form into which it was to harden was swung to the side of the truck when not in use, and there was also a shorter chute which was used when the concrete was to be poured into wheel-barrows and then rolled away to some other place. This smaller chute was affixed to the rear of the truck by pivots or hinges and could be swung down into the pouring position or swung up entirely out of the way when the large chute was attached. The smaller one could also be lowered to fit into the hollow of the large chute and this prevented the large one from swinging from side to side.
It is the contention of the plaintiff that the driver of the truck should have removed the large chute entirely, or at least should have raised it slightly so that it would have been stabilized by the smaller one and thus prevented from swinging laterally as he contends that it did.
Defendants declare that the large chute did not swing laterally but that plaintiff carelessly and unnecessarily attempted to raise the chute as the truck was backing towards the curb and that he was standing too close to the truck. Whether he attempted to raise the chute is a disputed question. He denies that he did so although Moray, his employer, says that he did. It was not necessary that it be raised because, as a matter of fact, it was not raised as it was backing across the curb and yet did not strike the curb.
Among the important facts disclosed by the record are these: that plaintiff knew of the intention of the driver to back the truck; that he watched the truck during the entire backing movement; that it was being backed into the exact position into which it was expected to back and that the movement was made at a very slow speed.
Whether or not the chute was swinging from side to side is disputed but we think it certain that even if it was swinging, plaintiff was not knocked by it into the position into which he was when the wheel of the truck ran over him. The chute was only 6 feet, 8 inches long and if swung laterally as far as it could swing, that is to say at right angles to the position in which it was when it extended to the rear, its end was less than 3 feet beyond the side of the truck. In order for it to have struck the plaintiff and to have knocked him towards the wheel of the truck, it would have been necessary for it to have been extended to the rear as its end passed him and then to have swung suddenly towards him almost at a right angle to the position in which it was when its end passed him. But even if the chute was swinging that far, it is clear from plaintiff's testimony that he knew exactly what was occurring because he says that he watched the entire movement, and, at one part of his testimony, stated that he was directing the operation. Even if the chute was swinging he knew it and knew that he should not stand too close to it. At first he said that it was swinging during the whole of the backing movement. Later, realizing the damaging effect of this testimony, he contended that it had not started to swing until the truck struck a pile of bricks which was in the way of one of the wheels.
Plaintiff was quite familiar with that type of work. He said that he "knew all about concrete and how a truck is built". He was the foreman on this job and had been a brick-layer for many years.
[3] It may be that there was negligence in the refusal of Green to raise or stabilize the chute, though the evidence does not justify a definite conclusion on this point. But even if Green, the driver, was at fault in that regard, or in any other way, it seems certain that the negligence of Duke, himself, was the proximate cause of the accident. As we have said, the truck was backing very slowly. He saw it coming and had selected the spot towards which it was backing. He knew that if the chute was not stabilized it was bound to swing laterally when the rear wheel struck the curb or struck the pile of bricks which he knew was in its path. He knew too that he was standing on the side opposite that on which the driver sat and that, therefore, the driver could not see him either by looking backwards or by looking into the rear view mirror, yet he assumed that dangerous position close to the path of the truck and was hit either by the backing truck or by the swinging chute. The record clearly shows his own contributory *Page 826 
negligence. Without that negligence he could not have been hurt, regardless of the negligence of the driver of the truck.
We conclude that his own negligence was the proximate cause of the accident.
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.