Dixie Machine, Welding Metal Works, Inc., brought this suit against Milton P. Boulet, doing business as Boulet Transportation Company, alleging that, as the result of an oral agreement made with an authorized representative of Boulet, it made certain repairs to the boom of a hoisting crane belonging to Boulet; that a fair price for the work, $195.67, had been charged, and that Boulet had failed and refused to pay for the said work. Boulet denied that there had been any agreement for the repair of the said boom and alleged that the said repairs had been made necessary because of negligence of employees of plaintiff corporation which had rented the hoisting crane from Boulet and had damaged it through carelessness or lack of skill. Boulet averred that the repairs had been made voluntarily by the plaintiff corporation and that he was in no way responsible for the cost thereof. He also averred that if there was any liability in him, the price charged was excessive.
Boulet then, assuming the position of plaintiff in reconvention, averred that he had rented the said hoisting crane to plaintiff corporation and had secured an operator at the request of the said corporation; that the charges for the rental of the crane and for the reimbursement of the wages and expenses incurred in connection with the operator had been agreed upon and that as a result there was due to him by plaintiff corporation the sum of $396.80, and he prayed for judgment in reconvention for that amount against plaintiff corporation, Dixie Machine, Welding Metal Works, Inc. The amount claimed in the reconventional demand was subsequently reduced voluntarily to $356.40.
When the matter came to trial in the First City Court, counsel for plaintiff objected to any evidence in support of the reconventional demand on the ground that such evidence was irrelevant and incompetent for the reason that the reconventional demand was based on a claim not necessarily connected with nor incidental to the main demand. This objection to evidence was based on the provisions of Article 375 of our Code of Practice, which reads as follows: "In order to entitle the defendant to institute a demand, in reconvention, it is required that such demand, though different from the main action, be, nevertheless, necessarily connected with and incidental to the same * * *."
After an extended trial, there was judgment dismissing the main demand and in favor of defendant, plaintiff in reconvention, for $356.40. Plaintiff has appealed.
The record shows that Milton P. Boulet, engaged in business as Boulet Transportation Company, is the owner of a ten-ton *Page 548 
crane having a sixty-foot boom, and mounted on the platform of a very large motor truck, and that this crane is used by Boulet in heavy construction work and is rented out by him to other persons doing similar work and who may need such a machine. Dixie Machine, Welding Metal Works, Inc., among other businesses in this locality, is engaged in heavy construction work.
The Dixie Company obtained a contract for the erection of a smokestack at the plant of Johns-Manville Company located on the west side of the Mississippi River.
Early in June, 1947, a representative of the Dixie Company telephoned Boulet's office and asked if it would be possible to rent the ten-ton crane of Boulet for use in the job at the Johns-Manville plant. The answer of Boulet was that that crane was not available at that particular time, but that it would be in a few weeks and that he would be glad to rent it to the Dixie Company, although, since, the crane had not yet completed the work on which it was engaged, there was no certainty as to just when it could be released to the Dixie Company. Boulet advised the Dixie Company that the charges would be $10.00 per hour and that there must be a minimum guarantee of forty hours' work. The Dixie Company agreed to wait until that crane would be available. There is considerable dispute as to whether or not, at that time, Boulet was advised as to the details of the job in which the crane was to be used.
A few weeks later the representative of the Dixie Company again called Boulet to know if the crane had completed the work on which it was then engaged. A few days later another representative of the Dixie Company called Boulet to discuss the use of the crane and advised that the Dixie Company had secured another job, also across the river, in which it would need the same crane as soon as it could complete the job at the Johns-Manville plant, and as a result it was agreed that the minimum time for which the Dixie Company would be charged in each job would be thirty-two hours.
There is also some dispute as to whether in any of these earlier conversations Boulet was asked to furnish an operator for the crane. When the crane was ultimately released from the job in which it had been engaged by Boulet, it was sent across the river to the point agreed upon and delivered to the Dixie Company. With it Boulet sent an operator, A. F. Zeagler, because prior to the time on which it was delivered he had been requested by the Dixie Company to furnish a competent operator. Zeagler reported to the superintendent or foreman of the Dixie Company, Albert Berniol, who took charge of the work and commenced the erection of the stack. During the early afternoon, while an attempt was being made to lift the stack and it was partially off the ground being raised to an upright position, the boom of the crane buckled or bent in a sidewise direction and was badly damaged. Just what was the cause of this and to whose fault it is to be attributed, we shall later discuss.
Before discussing those questions, however, it is necessary that we determine whether or not the evidence supporting the reconventional demand was properly admitted. Counsel for plaintiff vehemently protest that there was no connection whatever between the charge which they say was based on a contract for repairing the boom and the claim of Boulet based on the allegation that the damage to the crane resulted from negligence chargeable to the Dixie Company. Counsel say that only one issue was raised by the main demand and that this was whether or not there was an agreement for the repair of the crane. They say that if there was such an agreement, then there must be payment under this contract and that whether or not the Dixie Company is responsible in tort for the damage to the crane is a question not in any way connected with nor incidental to the claim made under the contract to repair the crane. We cannot agree with this view.
Defendant denies that there was a contract, but in effect says that if there was a contract for the repair of the boom, it was made necessary by the negligence of plaintiff. In other words, the tenor *Page 549 
of the defense is that when it appeared that the boom had been damaged and that it was necessary that it be repaired at once in order that it might be used on that and other jobs, defendant did not object when he was advised that plaintiff could make or was making the necessary repairs, but that his acquiescence in allowing the plaintiff to make the repairs should not be construed as an admission that plaintiff was not responsible for the damage or that the defendant would pay for it. All of these contentions are so closely interwoven that it would unnecessarily extend and complicate litigation to say that defendant must go to trial on the question of whether he must pay to the Dixie Company for the repairs to his boom and then must be relegated to an entirely different and new suit to determine whether he may recover that identical amount from the Dixie Company.
Nor do we think that the cases upon which plaintiff relies, as supporting the contention that the reconventional demand should be considered, are analogous.
In Mente Co., Inc. v. Louisiana State Rice Milling Co., Inc., 176 La. 476, 146 So. 28, the plaintiff sued for the balance due on the purchase price of certain rice bags which had been sold and delivered under a written contract. In its reconventional demand, defendant sought recovery for the value of certain defective bags which had been delivered to it under an entirely different contract. It was held that the two claims arose out of two totally different contracts and that, therefore, the claim of the defendant, based on one contract, could not be set up in reconvention in the suit on the other contract.
Jones v. Davis, La. App., 155 So. 269, is in no sense in point here as can be evidenced by a mere reading of syllabus number three, which reads as follows: "Compensation and Reconvention: In suit on account by physician for services rendered and medicine furnished, credit claimed by defendant for potato plants sold physician held not demandable in reconvention, where physician and defendant were both residents of same parish and demand was not connected with nor incidental to main action (Code Prac. art. 375)."
In Jackson v. Taylor Bros. Garage, Inc., La. App.,4 So.2d 41, in spite of the fact that the Court found that there was no connection whatever between a note for a part of the purchase price of an automobile truck on which one claim was based and an open account covering the sale of petroleum and other products on which the other claim was based, it did not dismiss the reconventional demand.
After reading these decisions, we find ourselves confirmed in the view that there is a connection between the two claims which are here involved, and we consequently hold that the evidence tendered in support of the reconventional demand was properly admitted.
It thus becomes necessary that we determine just what was the reason for the buckling of the boom and just who was responsible for the negligence, lack or skill or fault which caused this buckling.
There is much disagreement as to the cause, and we think it unnecessary to set forth a detailed discussion of the testimony on this point. We reach the conclusion that the primary cause of the disaster was the method which was employed in attempting to lift the stack and to place it upright and in position.
It is shown that the cable which passes through the various pulleys or blocks was attached to the stack near its center and that it was intended that as the cable was drawn in around the drum of the hoisting engine, the stack would gradually assume an upright position and that its lower end, which was weighted, could be placed in its proper location and then the upper end could be raised until the stack should assume its final vertical position. It is shown, too, that the upper end of the boom was not directly over that part of the stack at which the cable was affixed and that, therefore, as the stack was raised, there was a side pull on the boom. It is shown, too, that a crane of this type is not braced so as to withstand a severe side pull.
Mr. Boulet, owner of the crane, did not witness the accident but he gave a *Page 550 
statement concerning the cause and rendered an opinion based on what he knew of the facts, which coincides with the view which we have set forth concerning the effect of the side pull. He said: "Well, the boom was over the stack cross-wise and it was tied in the center, and when they started with that block and line to pull it in, whether that crane had jammed or not, that boom was definitely certain to fold because they were pulling against the side that had no support, and as the stack was fifty-five feet up in the air they had a leverage of fifty feet against that stack to bend it; the pictures you have there show that's the direction the stack went over in, they were drawing the stack up against the side of the boom; * * *."
As a secondary or contributing cause of the folding of the boom, the record indicates that, in an attempt to release a cable jam on the drum, the brake was partially released and the stack was permitted to, drop suddenly a few feet in the hope that this sudden jerk would release the jammed cable. This additional sudden jerk, coming as it did from a side position, undoubtedly threw upon the boom an additional side strain greater than it could withstand.
There is no doubt in our minds that these two factors caused the folding of the boom. Who then is responsible?
We find that the crane was not defective and that had it been properly used in the raising of this stack, no accident would have occurred. It necessarily follows that the cause, since it was not attributable to a defect in the crane, must be charged to carelessness on the part of someone, or to the improper method of using the crane. It is made very clear that in an operation of this kind the foreman or superintendent is in complete charge and that his orders must be obeyed. This foreman in this instance was Berniol, a regular employee of the Dixie Company. It is made clear also that an operator of a crane, who, in this instance, was Zeagler, has no right to refuse to obey orders of the superintendent except that if he believes that the carrying out of the orders will endanger himself, he may refuse to carry them out. But in such a case the superintendent may require him to leave and may then proceed with the operation, using such method as he thinks best.
When the cable jammed it was impossible, without releasing this jam, to continue the operation. Zeagler, the operator of the crane, and Berniol, the superintendent, discussed the method to be employed in releasing the cable and agreed that the brake should be released and the stack permitted to drop a few feet, in the hope that this jolt would release the jam. There is considerable dispute as to whether this method was suggested by Zeagler or by Berniol, but we have no hesitation in finding that whoever suggested it, it was agreed to by Berniol, the general superintendent. He complains that, in releasing the brake, Zeagler did not await his orders, and it is shown that it is customary for the operator of the crane to operate it only after signals are given by the superintendent or someone in charge. We do not see, however, that this failure on the part of Zeagler to wait for a hand or other signal from Berniol had anything to do with the ultimate result. The method had been agreed upon, and when Zeagler mounted the crane and released the brake, he did what had been agreed upon, and we think that it was immaterial that he did not wait a few seconds for Berniol to give him the signal to do exactly what he did do.
We, therefore, reach the conclusion that the fault was attributable to Berniol, — first, in attempting to raise the stack by pulling it sidewise and thus putting a severe side strain on the boom, and second, in throwing upon it this additional sudden strain which resulted from the partial release of the brake. If we are in error in holding that Berniol was entirely at fault and in not finding that Zeagler, too, might have been careless, we do not see that any different result would be brought about, for, as we view the evidence, it shows that Zeagler, during that entire operation, was the employee of the Dixie Company and was not the employee of Boulet. *Page 551 
Zeagler was not a regular employee of Boulet. He was a member of the proper union and whenever Boulet needed someone to operate that crane, he would call on the office of the union to furnish an operator. It is true that since he was of the opinion that Zeagler was a most competent man, he asked for him whenever he was available. The record shows also that Zeagler was obtained by Boulet from the union office when Boulet requested that an operator be furnished with the crane. As a result of this situation, even if Zeagler had been regularly in the employ of Boulet, we think that when the Dixie Company rendered the crane and asked that an operator be furnished, when the crane and the operator commenced the job which the Dixie Company had contracted to perform, they did so under the orders of the Dixie Company and Zeagler became the employee "pro hac vice" of the Dixie Company.
The fact that Boulet paid his hourly wages and required that the Dixie Company reimburse him for these wages and for such payments as had to be made for social security and for those other myriad expenses to which an employer is now subjected, did not change the situation. Boulet did this for the convenience of the Dixie Company. It was required that someone make the necessary social security returns; that someone keep the employment record of Zeagler, and Boulet agreed to do this and required the Dixie Company to make reimbursement. The fact that the reimbursement slightly exceeded the actual wages does not, we think, change the situation. This slight excess was used for those additional deductions and also to cover the cost of bookkeeping made necessary by this method of procedure.
The truth of the matter is that Boulet had nothing whatever to do with the operation which was being conducted by the Dixie Company, except that he rented to the Dixie Company his crane and secured for the Dixie Company the services of an operator. He was not a subcontractor employed to do any part of the job. The entire job was being done by the Dixie Company. And that particular operation was being done under the supervision of Berniol, the superintendent or foreman of the Dixie Company.
It is well settled that one who is in the general employment of one employer may become the borrowed servant of another employer and that when he does, the general employer is not responsible for the acts of that servant who has been loaned to the other employer.
In Vol. I A.L.R.2d p. 303, appears the following statement: "Generally, one who has the status of general servant or employee may be lent or hired by his master to another for some special service so as to become, as to that service, the servant of such third person, the test being whether, in the particular service which he is engaged to perform, he continues to be under the direction and control of his master or becomes subject to that of the person to whom he has been let for hire. And where an employee, with his consent, has thus been let by his general employer to another person, he is deemed to have become, for all purposes of the relationship of master and servant, the employee of the borrower. However, to establish the fact, under the loaned servant doctrine, that the servant of one has transferred his services to another pro hac vice it must appear that he has assented, expressly or impliedly, to such transfer. No one can transfer the services of his servant to another master without the servant's consent. It must further appear that the servant has, in fact, entered upon the service and submitted himself to the direction and control of the new master. His assent may be established by direct proof that he agreed to accept the new master, and to submit himself to his control, or by indirect proof of circumstances justifying the inference of such assent."
We ourselves have recognized this situation in Spanja v. Thibodaux Boiler Works, Inc., La. App., 2 So.2d 668 and in Duke v. Dixie Building Material Co., La. App., 23 So.2d 822.
It has also been recognized by our Brothers of the First Circuit Court in Hutto v. Arbour, 4 So.2d 84, and in Cali *Page 552 
v. Cloverland Dairy Products Co., 21 So.2d 166.
In 39 Corpus Juris 558, section 669, the principle is stated as follows: "Servant of One Master Controlled by Another. Where one person lends his servant to another for a particular employment, the servant for anything done in that particular employment, must be dealt with as a servant of the man to whom he is lent, although he remains the general servant of the person who lent him; and, if the servant receives injuries in such employment, from the negligence of a servant of the person to whom he is lent, he cannot recover therefor from the person to whom he is lent. Conversely, for the negligence of such servant in the particular employment of another master, the general master is not liable. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired. Nevertheless, the servant so loaned must consent to the change of masters, expressly or impliedly; and to bring the case within the rule the services rendered by the employee for the third person must be such as to create the legal relation of master and servant. Actual exercise of the right to control the servant of the general employer in the service of a special master is not necessary where the special master is willing to rely upon the experience and skill of the loaned servant. However, the fact that the general master pays the wages of the servant does not preclude him from becoming pro hac vice the particular servant of another." See, also, 56 C.J.S., Master and Servant, § 330.
An interesting question is raised by the contention of the plaintiff that when the damage was sustained Boulet requested that the repairs to the crane be made by the Dixie Company. The argument is that since Boulet asked that the repairs be made by the Dixie Company and by inference agreed that he would pay for the repairs, he cannot now be heard to say that the Dixie Company was responsible and should have made the repairs at its own expense.
In the first place, the record leaves it considerably doubtful as to whether Boulet made any such contract for the repair of the boom. He says that the first knowledge that he had came to him on the day after the boom had buckled and that then he was merely told that the Dixie Company was making the repairs and was requested to give his permission to make some slight change in the boom. If this is true, obviously he had the right to assume that the Dixie Company recognized its responsibility and was making the repairs because it had damaged his crane. If, on the other hand, however, he was told that the Dixie Company could make the repairs and would make the repairs for him, we see no reason why he would not have asked the Dixie Company to proceed with the repairs without thereby estopping himself to later contend that the Dixie Company was responsible for the damage which had made the repairs necessary. Both he and the Dixie Company realized the extreme importance of having repairs made immediately so that the crane might proceed with the work in which it was engaged for the Dixie Company, and might then undertake the second job which the Dixie Company had been employed to do and might then be released to him for such other work as he had on hand.
We do not see that it was necessary for Boulet to say to the Dixie Company that he did not wish them to make the repairs, that he would have someone else do so, pay that someone else and then make claim against the Dixie Company. It was most reasonable for him to ask the Dixie Company to make the repairs and then to leave open to discussion or litigation the question of who was responsible for the damage.
There seems to be no dispute over the question of the amount to which Boulet is entitled if he may set up his claim in this suit, as we have held that he may.
The record conclusively shows that the amount claimed by him, $356.40, is correct.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed. *Page 624