ELLIS, Judge
(dissenting).
Morris and Meredith, Inc., the employer of the plaintiffs, Benoit and Holloway, was *516 engaged in the oil well drilling business, and in attempting to set up a rig on its first contract and ¡first location for the purpose of drilling an oil well it ¡became necessary that quite a bit of welding ¡be done in and around and on different parts of the rig. The Hunt Tool Company was engaged in the business of renting, drilling bits and other material used in the oil well drilling business, and it was also engaged in the welding business. It is shown that they kept in their employ regularly twelve skilled welders and when, as in the present instance, an oil rig was ¡being set up and it was necessary that welding be done a representative of the Hunt Tool Company would contact the owner or superintendent of the drilling rig in order to obtain the business for the Hunt Tool Company, or, as it was known that the Hunt Tool Company was engaged in the business of welding, the owner or superintendent of the drilling rig might contact the company. It might be that the drilling company would also need drilling bits or any other equipment which they let out on rental basis and for which it is shown on the bill head of the Hunt Tool Company the drilling company would be responsible if same was lost or stolen.
In the present case, it is shown that a representative cf the Hunt Tool Company had contacted Morris and Meredith and solicited their business and as Morris and Meredith had no regularly employed welders in their service their tool pusher, West, called the Hunt Tool Company and it agreed to do all the welding necessary on the rig for a flat price per hour. On May 4, 1946 one of the Hunt Tool Company’s regularly employed welders was Henrie Guillory, and in accordance with its contract with Morris and Meredith, Inc., they had sent this welder, a helper and all necessary welding equipment, both acetylene and electrical, to the location of the drilling rig.
The superintendent, Morris, pointed out a fuel tank which at the time was partially filled with the fuel oil, which was leaking and needed welding, and Guillory questioned the advisability of welding this tank while it had the oil in it, but after a discussion and after Morris had told him that he could use the electric torch, he started to weld the' tank with it. The rod not being satisfactory, he ordered his helper to bring •him a different sized rod, and while waiting he took his unlighted acetylene torch and put it through the opening in the top of the ¡fuel oil tank, placed a cotton glove in the hole through which he had put the torch, and filled the empty portion of the tank with oxygen in order to put pressure on the fuel oil so that he could definitely determine the nature and extent of the leak. He then removed the cotton glove and the torch and walked about two feet from the tank with the intention of welding another piece of machinery that had previously been pointed out to him, and ignited the torch and the explosion happened immediately, which resulted in the injuries to the plaintiffs.
To the plaintiffs’ petition, the defendants filed an exception of no cause or right of action based upon the ground that under the facts alleged the Hunt Tool Company was not a third party as referred to in Section 7 of the Act. This exception was heard before Honorable John T. Hood, Jr., one of the Judges of the Fourteenth Judicial District Court, and in a well-written and reasoned opinion he overruled the exception and held that Hunt Tool Company under the allegations of the petition must be considered as a third person within the meaning of the Act, insofar as the employment of the plaintiffs Benoit and Holloway were concerned. The defendants further argued on the exception that according to the allegations of fact contained in the petition Guillory became the particular employee pro hac vice of Morris and Meredith, Inc. and, therefore, his original or immediate employer, Hunt Tool Company, was not liable in tort for Guillory’s negligent acts while so employed. His Honor in the Lower Court, in the same opinion, held that there were no allegations in the petition of plaintiffs which in any manner showed that Guillory was loaned or hired to Morris and Meredith or that he became a 'fellow servant of Benoit and Holloway.
The defendant, when it filed its answer, raised the same defenses as were argued in the exception, and a different judge of the Fourteenth Judicial District tried the case on its merits and held that the Hunt Tool *517 Company was not a third person within the meaning of the Act.
The majority opinion does not specifically pass upon the question as to whether the Hunt Tool Company was a third person within the meaning of the Compensation Act hut holds that Guillory was a third person, with which I agree, hut I also am of the opinion that the Hunt Tool Company was clearly a third person within the meaning of the Act. The majority opinion stated the question to he decided as follows: “Since Henrie Guillory was a ‘third person’ within the purview of our Compensation Statute, supra, and since his negligent act was while he was in the course and scope of his employment, his employer, at the time of the accident, is responsible therefor. The important question now remaining is to determine his employer at the- time of the accident.”
I will discuss the case with this question in mind.
The majority opinion holds “that Henrie Guillory became an employee, pro hac vice of Morris & Meredith Inc.; that,-as such, Morris & Meredith, Inc. was liable for Guillory’s negligence, and not Hunt Tool Company. Since the plaintiffs and Guillory were the employees of Morris & Meredith, -Inc., their remedy is exclusively governed by the Compensation Act.”
I am of the opinion that under the facts in this case Guillory, at the time of the accident and the entire time that he welded on the drilling rig of Morris and Meredith, Inc., was the employee of the Hunt Tool ■Company and was never an employee of Morris and Meredith “pro hac vice,” either by having been loaned to or borrowed by or hired by Morris and Meredith, for I believe, under the facts and the law applicable thereto, that the Hunt Tool Company was a subcontractor or an independent contractor.
There is no dispute that Henrie Guillory was one of the twelve skilled welders which Hunt Tool Company regularly kept in their employ in furtherance of its welding business. In my opinion it is a question of whether Hunt Tool Company hired to Morris and Meredith its welders, particularly Guillory, on the day of the accident, the ■helper and all necessary welding equipment, or whether it was a subcontractor or independent contractor.
In Crysel v. Gifford-Hill & Co., La.App., 158 So. 264, 265, the Court held:
“One contracting to do certain work according to plans and specifications prepared by co-ntractee, but who exercises full control as to method' of doing work, save that it must be up to certain standard, is an ‘independent contractor,’ for whose actions contractee is not liable, though he exercises some supervision over work to see that it is done according to contract.
“Subcontractor employed by contractor to do dirt work on state highway, who was financed by contractor and subject to his general control and supervision, held ‘independent contractor,’ and not ‘employee’ of contractor, and hence contractor was not liable for negligence of subcontractor’s employee.
* * * * * *
“ ‘And our own courts have repeatedly held that the mere fact that a proprietor retains general supervision over work to be constructed for him by another, for the purpose of satisfying himself that the contractor carries out the stipulation of his contract, does not make him (the proprietor) -responsible for the wrongs done to third persons in the -prosecution of the work. Lutenbacher v. Mitchell-Horne Const. Co., 136 La. 805, 67 So. 888, 19 A.L.R. 206; Robichaux v. Morgans’ L. & T. R. & S. S. Co., 131 La. 727, 60 So. 206; Robideaux v. Hebert, 118 La. 1089, 43 So. 887, 12 L.R.A.,N.S., 632; Muldry v. Fromherz & Drennan, 142 La. 1087, 78 So. 126.’ ”
In Ravare v. McCormick & Co., La.App., 166 So. 183, 185, a definition of an independent contractor and a test to be applied was given by the Court in the following words:
“What is an independent contractor? It is defined as ‘one who is rendering services, an independent employment or occupation, and represents the employer only as to the results of his work, and not as to the means whereby it is to be done.’ 39 C.J., § 1517, p. 1315. The most generally applied test of the relationship is the ‘right of control as *518 to the mode of doing the work contracted for.’ Ibid, § 1316; Faren v. Sellers, 39 La. Ann. 1011, 3 So. 363, 4 Am.St.Rep. 2S6; Gallagher v. Southwestern Exposition Ass’n, 28 La.Ann. 943.
“The circumstances which go to show one to ibe an independent contractor are the ‘independent nature of his business, the existence of a contract for the performance of a specified piece o'f work, the agreement to pay a fixed -price for the work, the employment of assistants by the employee who are under his control, the furnishing by him of the necessary materials and his right to control the work while it is in progress-.’ 39 C.J. p. 1316, § 1517.”
I also accept as if written herein the law as stated -in the majority opinion in the 35 A.J., Sec. 18, Pg. 455 and Sec. 541, Pg. 970, but believe that an application of the test as laid down by the quoted law will show under the facts in this case that Hunt Tool -Company is a subcontractor.
In the present case, the Hunt Tool Company -contracted to do all necessary welding on -a particular oil rig of Morris and Meredith, Inc. 'for the fixed price of $5.50 per hour, and the Hunt Tool Company employed its own welders and assistants and ■furnished to them all of the welding equipment and materials necessary to carry out its contract. It only remains necessary to discuss the right of the Hunt Tool -Company to control the method, mode or details of the actual welding while it was in progress in order to satisfy the requirements of the law that it was an independent contractor.
Hunt Tool Company has pitched its defense upon the ground that it had no supervision or control over the welders or the helpers after they left its place of business, and at no time did they exercise any control while Guillory and the other welders ■worked -on the Morris and Meredith drilling rig job. It is not a question of whether the Hunt Tool Company exercised control and supervision after they had left their office, but whether the Hunt Tool -Company had the right to exercise control and supervision as to the details of the work. Morris, the superintendent of the Morris and Meredith company, testified when asked what agreement he had with the Hunt Tool Company for "this welding work,” that there was hardly ever an agreement made. “They (meaning Hunt Tool Company) just order out the welders. There is no written agreement or anything like that; (Hunt Tool Company) just order out the welder and the helper with whatever equipment they (Hunt Tool -Company -or the welder and his helper) -might need to perform the job.” (Par-enthetics added.) In other words, the Hunt Tool Company would order out its regularly employed welders and helpers with whatever equipment might be necessary to perform the welding for which Hunt Tool Company had -contracted. It is shown in the present -case, for example, on April 29, 1946, the Hunt Tool Company had two welders with one helper and equipment; on April 30, 1946 Hunt Tool -Company sent two welders with one helper and equipment; on May 1st, 1946, two welders with helper and equipment; on May 2, 1946 Hunt Tool Company sent one welder and one helper and equipment; -on May 4, 1946, the day of the accident, Hunt Tool Company sent one welder with one helper and equipment, and thereafter, through May 8, 1946, Hunt Tool Company sent one welder and one helper and equipment each day. The dates given by me as well as- the dates given in the -majority opinion are the same, except that therein it is stated that -only those dates the drilling company ordered them from Hunt Tool -Company, -which I think is an error. The evidence is to the effect that after the Hunt Tool -Company had solicited the business of Morris and Meredith, Inc., and after Morris and Meredith notified them or gave them the business of welding all necessary parts of its rig, the Hunt Tool -Company, on April 29, 1946, sent two welders with one helper and equipment to begin the fulfillment of its contract, to do -all necessary welding on the rig. From then on, it is shown that at the end of each day Morris or West of Morris and Meredith told the welder whether or not there was more welding to be done on the rig so that Hunt Tool -Company could send one or two welders and a helper or helpers, if it thought necessary, back to the drilling rig *519 the next day. There is no evidence to show that Morris and Meredith ever designated the number of welders to he sent to the rig, nor ordered out in the sense of hiring from the Hunt Tool Company any welders.
The dates upon which the Hunt Tool Company did welding for Morris and Meredith are shown by tickets or bills on Hunt Tool Company’s billheads, which have been introduced in evidence, and on which it is shown the number of welders and helpers who worked on the dates shown on the tickets or billheads on the Morris and Meredith drilling rig, with a statement of what they did together with the number of hours on location plus traveling time. For example, the ticket or billhead on the top contains in big letters, “Hunt Tool 'Company” and underneath its places of business, “Houston, Corpus Christi, Bay'City, Texas; Jennings, Harvey, La.” “General Office, Houston, Texas” and then lists the phone No. and Post Office Box Number, and to the right of this is the number of the ticket or bill head in large red letters; “To Morris & Meredith Contr. Co., Address, Homewood,” then the rig number, lease number, well number. Underneath is written “Farmers Land & Canal Company, Rig No. 3.” Under this is printed “This Charge for the following bits and material furnished you on rental 'basis. It is hereby agreed that in case of loss or theft that you will reimburse the Hunt Tool Company.” I do not think this clause applies to the present case for there is nothing to show that this equipment was furnished on a rental basis. Then, under this we have a column with the word “Quantity”, the next column with the word “Bit Size,” written at the top; the next column with the word “Bit No.” written at the top, then over to the right and at the top of a column is- the word “Price.” Then, written in pencil by Hunt Tool Company is the following: “Two welders with one helper and equipment to location doing cutting and welding on your substructure as instructed.” Under this is “9 hrs on location plus traveling time.” Under this and apparently in the writing of the welder is “11 hrs welder and 1 helper @ 9.90,” and in the column under “Price,” is $108.90. Jennings, Louisiana is stamped underneath thisx then the date, 4-29-46, then the printed words “Received 'by:” and signed “I, L. West.” Each one of these tickets or bills is worded practically the same except one on May 4, 1946 which has written on it “Send welder, with helper equipment to location .to do rig up work- & weld on diesel tank as instructed.”
While the majority opinion has taken the statement' and information on the ticket as I have given it to mean that Morris & Meredith ordered welders and helpers and equipment each day from the Hunt Tool Company, to me it is clearly nothing more nor less than a statement by Hunt Tool Company as to the number of welders and helpers who worked on the Morris & Meredith welding job, with the general statement of what cutting and welding they did, together with the charges therefor. For example, “Cutting and welding on the substructure as instructed,” simply means that on that date it had sent two welders and a hélper and equipment to the Morris & Meredith drilling location who cut and welded on Morris and Meredith’s substructure as pointed out or, in other words, as needed welding. The words, “As instructed,” on these tickets, when taken in connection with the entire written part of the bill which was made out by Hunt Tool Company, simply means that their employees cut and welded on certain parts of the drilling rig of Morris & Meredith which required it. The two tickets in evidence dated May 1st, 1946 show more clearly the meaning of “as instructed” for on both of them is written “welder with helper and equipment to location to do cutting and welding on your stand pipe, making rat hole and other cutting & welding as instructed.” I do not see how any other interpretation could 'be given to the words “as instructed.” It does not mean that Morris and Meredith instructed the welders- as to the mode and method of the details of doing the job.
Neither, in my opinion, do these tickets mean that Morris & Meredith ordered in the sense of employing or hiring these welders or helpers. There is a document introduced in evidence which is a copy of invoice of Hunt Tool Company in which the Hunt Tool Company has totalled the *520 amount of the services and balance due by-Morris and Meredith for the welding and has written- in each instance “send two welders” etc. However, this is no more evidence that Morris and Meredith ordered the welders sent to them than it might be, which I believe it is, an order from Hunt Tool Company to possibly their shop superintendent or employee in charge of the welders to send the welders to the Morris and Meredith company in fulfillment of its contract. As far as the evidence goes, it was entirely up to the Hunt Tool Company as to how many or which one of its welders or helpers it sent each day on this job, but it is -shown that one of the welders so sent by the tool company from beginning and up to and including the last day that it- did any sending on this rig was Henrie Guillory, who was in charge of the crew. According to his testimony, he was the foreman of the crew. Of course, it is shown that Guillory gave all orders to his helper and had complete control and supervision over him. The testimony does not show that Guillory was designated as foreman nor placed in charge of the welding crew by Morris and Meredith but, on the contrary, evidently obtained such authority from the Hunt Tool Company.
Henrie Guillory testified that he reported each day to West, the foreman of Morris and Meredith, for- full instructions as to what the crew was to do. He also stated that he -did not know how long he would work nor what he would be required to do. Of course, he meant what welding he would be required to do because the testimony shows that that is what he was trained for, what he was employed for by the Hunt Tool Company and all he ever did for the Hunt Tool Company and all that he was ever supposed to do on the drilling ■rig job.
It is clear from the evidence that Guil-lory expected to work as long as he had instructions from the Hunt Tool Company to do so on the drilling company’s job, and it is further shown that under the contract that Hunt Tool Company was to do all welding necessary on this particular rig. The fact that the Hunt Tool Company did not go over and check each little piece of machinery - that needed welding and have this information definitely before it sent its employees to do the job is immaterial. It chose to agree to do all welding on the rig for Morris and Meredith which theyt pointed out as being necessary, and for this service it was agreed that Morris and Meredith would pay by the hour. Therefore, the lack of -Such knowledge on the pa-rt of Guillory is immaterial. There was a definite and specific understanding as to the piece of work to be done. Guillory testified that he took all of his directions and instructions from Morris, the superintendent of Morris and Meredith', or from West, its “tool pusher.” The testimony shows that all that Morris or West did was to tell or show Guillory what to weld, which was clearly contemplated and implied by the agreement. It is shown that Morris would also ask Guillory to weld a certain part of the machinery prior to welding another part. It is easy to understand that with various and sundry parts of the machinery needing welding,- and with other workers upon the machinery at the same time that it was best for both parties, Hunt Tool Company and Morris and Meredith, Inc. that the welding be do'ne as pointed out by and when suggested by Morris -and Meredith. Such action was merely in the nature of a general supervision and was not the exercising of control as to the means or method to be used in accomplishing the welding of the machinery.
The Hunt Tool Company in addition offered the testimony of its shop foreman who had supervision of the welders to the effect that he exercised no supervision over them after they left the Hunt Tool Company place of business to report to the Morris ■and Meredith rig. He did not testify as to what the agreement was with Morris and Meredith or that the Hunt Tool Company had not contracted to do the welding on this rig. Hunt Tool Company also offered the testimony of its shop superintendent who stated that he had contacted Mr. Morris and Mr. West, who were connected with the Morris and Meredith drilling concern, sometime in May, 1946 in order to solicit any business they might be able to give “us” in the setting up and operation of *521 their drilling rigs. He was told by Morris and West that should they desire to use any or part of the Hunt Tool Company’s services they would contact the Jennings shop. This witness did not testify that Morris and Meredith had hired this welder and helper and rented the equipment of Hunt Tool Company.
The mere fact that the shop foreman did not supervise the welders and their helpers after they left the Hunt Tool Company place of business is not proof that the Hunt Tool Company still did not have the right to do so. That is one reason why Hunt Tool Company employed these twelve skilled and trained welders and owned the necessary equipment for them to do a job with. It was not necessary for the Hunt Tool Company to exercise its right of control or supervision as these men were skilled in their trade and knew how to.perform the job. For this same reason, I do not believe it was contemplated by Morris and Meredith that they were to exercise the right of control or supervision, and the fact that they could obtain a complete welding service from the Hunt Tool Company and would not be required to direct or control the details of the work induced them to contract with the Hunt Tool Company.
While there is testimony of a general nature in the record which I have referred to, or simply a flat statement made by some of the witnesses that Morris and Meredith had full supervision and control of the welder or welders, I am. of the opinion that the only supervision and control exercised by Morris and Meredith was as shown by the questions propounded by the Court and the answers given by the witness Morris to those questions, as follows:
“The Court: Mr. Morris, you answered one question that is contrary to the idea that I obtained from the balance of your testimony. I just want it straightened up and cleared up in my own mind. You answered the questions propounded by counsel in other words, the welder was under •the complete supervision of the superintendent or the man in charge of your job, you answered that question in the affirmative. Now, I understood from your testimony up to that point, that when a welder came on the job you pointed out the job that you wanted him to perform.
“The Witness: That is right.
“The Court: And then he performed that job at the time that you told him or directed him to perform it; in other words, when it didn’t interfere with the rest of the business of setting up the rig. Is that correct?
“The Witness: Yes, sir.
“The Court: Now, did you tell him how to do the welding?
“The Witness: Not all the time, no, sir.
“The Court: Did you ever tell him how to do the welding?
“The Witness: I did on that particular job. Maybe I had better put it this way: I suggested it.
“The Court: You suggested on this particular tank that he use electrical equipment.
“The Witness: Yes, sir.
“The Court: But on any other job — for instance, if he were welding a collar on a pipe, would you tell him what to use?
“The Witness: No, sir.
“The Court: Except to say that that collar has to be welded and you can work now or you can work at 5:00 o’clock when it doesn’t interfere with .the rest of our work. Is that the way you would handle it ?
“The Witness: Well, of course, a job like that is supposed to take a certain amount of time, and it is usually done by electric. We don’t have to suggest what to use.
“The Court: I am only using the welding of a collar on a pipe as an example. I don’t mean actually. Well, you haven’t cleared it up in my mind yet; The thing I want to know is this: When this welder came on the job, now. did you show him the particular work that you wanted him to do that day or while he was on the job and then let him go. ahead and do it, or did you tell him how to do it ?
“The Witness: No, we just.told■ him what to do.
“The Court: Then, the only supervision, as I understand it, that you had of the *522 welder was to show him the job and to tell him when he could do the work so that he wouldn’t interfere with the balance of the work on the job?
“The Witness: Yes, that is right.
“The Court: Now, it was your suggestion on welding this seam in the tank that the electrical equipment would be safe to use on that job?
“The Witness: Yes, sir. That was my suggestion.
“The Court: And he did weld it with electrical equipment. Is that right?
“The Witness: That is right, as long as I was there, he was welding with electric equipment.
“The Court: I see. You don’t know whether he completed the job with electrical equipment?
“The Witness: No, I don’t.
“The Court: All right.”
After the Court had examined the witness as shown above, counsel for Hunt Tool Company further cross examined the same witness and at the close of this cross examination the Trial Judge made the following remark which is in the record:
“Somebody had to tell the man what to do, didn’t they, when he came on the job? If the welder came on the job and nobody told him what to do he wouldn’t do any work, Is that right?”
“The Witness: No, sir. That is why I— someone would have to tell him the work to be done and when to do it.”
The only instance which might be taken as tending to prove that Morris and Meredith had the right to control the welder and his helper as to the details of the work was when Morris suggested to the welder that he weld the fuel tank with the electric torch rather than the acetylene torch.
There is no doubt that Morris and Meredith did point out the various parts of the fig to be welded which, as stated by the Trial Judge, had to be done or there would have been no welding and was not an act •of supervision of the details of the work nor such an act of supervision as would tend to prove that Morris and Meredith ;had the right to exercise such control. The Hunt Tool Company alone paid the wages of the welder and his helper and owned all the equipment they used, and this welder and helper were responsible for this equipment.
It is further shown that the Hunt Tool Company only had the right to dismiss Guillory or anyone of its welders. Morris and Meredith could only report to the Hunt Tool Company that Guillory’s work was not being done satisfactorily, whereupon the Hunt Tool Company could investigate the complaint and, if justified, could fire Guillory, and if in their opinion the complaint was unjustified, could retain him in their service.
The majority opinion further states that “the loan-servant doctrine has been recognized by this court and the other appellate courts of this State. See Sadler v. May, La.App., 185 So. 81; Hutto v. Arbour, La.App., 4 So.2d 84; Cali v. Cloverland, La.App., 21 So.2d 166; Spanja v. Thibodeaux Boiler Works, La.App., 2 So.2d 668; Duke v. Dixie Bldg. Material Co., La.App., 23 So. 2d 822; Dixie Machine, Welding & Metal Works v. Boulet Transfer Co., La.App., 38 So.2d 546.”
I do not believe these cases are applicable to the present case.
In the case of Sadler v. May, supra, Dan Wilson was the owner of a truck which he hired out to the defendant May Brothers, together with the services of Sadler as driver, at a given price per day. The defendant • attempted to call Wilson in warranty on the ground that at the time the plaintiff was injured he was in the employ of and driving the truck for Wilson. The Court held [185 So. 83] : “The lower court properly dismissed the call in warranty made on Dan Wilson as under the testimony adduced he bore no relation whatever towards the defendant except that of the owner of a truck which he had hired out to it, together with the services of the plaintiff as driver. Wilson himself had no supervision or control whatever over the plaintiff who was responsible only to the defendant for the work which he performed.”
The facts in this case are different from those in the one at bar. In the present case, *523 the Hunt Tool Company did have supervision and control over its welder Guillory and his helper, and both were responsible to the Hunt Tool Company for the work which they performed for Morris & Meredith under penalty of dismissal by Hunt Tool Company.
The case of Hutto v. Arbour, supra, involved an automobile accident in which the plaintiff sued Arbour, the driver of the wrecker truck, Sidney J. Babin and the Iberville Motor Co., Inc. The latter two were sought to be held liable for the negligent acts of Arbour on the ground that at the time of the accident he was on a mission for Babin and the Iberville Motor Company. The Court found that Arbour was not on a mission for the motor company although regularly employed by the motor company. He was not at that time acting within the scope of his employment and in the furtherance of the motor company’s business. The Court stated [4 So.2d 88]:
“All of the evidence shows that Babin sent Arbour to Baton Rouge to pick up the burned truck and bring it to his junk lot; that Babin gave Arbour the money to pay for the burned truck and paid Arbour for expenses in crossing the river going to and returning from Baton Rouge. Arbour did not charge for the trip as he had accommodated Babin, a fellow employee, on several occasions. It is true that Arbour left some fifteen minutes before his regular quitting time at the motor company and got permission from the shop foreman to leave and take the wrecker which was being used by the motor company to make the trip. He did not go on this trip under any orders or instructions from the motor company or any of its agents, nor did he make the trip on time paid for by the motor company. An employee of Babin working at the junk lot made the trip with Arbour to help him pick up the wreck.
******
“The situation was that of one in the general service of another (Arbour in the general service of the motor company as a mechanic) being transferred, with his consent, to the service of a third person (Ba-bin) so that he became the servant of the third person and ceased to be the servant of his general employer, in which case the general employer is not liable for the acts of the servant. For a concise statement of the law on this point, see Vol. 5 Blashfield’s Cyclopedia of Automobile Law and Practice, pp. 71-74, §§ 2941 and 2942. Of course, as is stated in the last paragraph of Section 2941, ‘a servant may have two employers at a given time under certain circumstances, and one owning or ordinarily controlling the use of an automobile may become liable for injuries caused by the negligence of another in charge thereof, though not exclusively his servant at the time of the accident.’ But such a situation is not presented here.”
Certainly, under the facts of this case it is not applicable to the case under consideration, as I have given, and understand the facts.
The case of Cali v. Cloverland Dairy Products, Inc., supra, merely cites the Hutto v. Arbour case and reiterates the doctrine laid down therein, which is not applicable to the case at bar.
The case of Spanja v. Thibodeaux Boiler Works, supra, was one in which the plaintiff and his associate were the owners of a boat, all of which were under contract to The Texas Company, and it was the duty of the plaintiff to transport machinery, supplies and employees of The Texas Company back and forth between the scene of drilling operations and Empire. A boiler of The Texas Company needed repairs and it engaged the Thibodeaux Boiler Works to make them and it was necessary to transport certain heavy machinery by means of plaintiff’s boat. During the loading of the machinery upon the boat, the plaintiff was assisting by attempting to guide an air compressor down the runway when it fell and struck him. The Court held that the plaintiff was an employee of The Texas Company and, naturally, was barred from any recovery in tort in so far as that company was concerned. It further held that the transferring of machinery to the boat was not the job of the plaintiff and was not the job of The Texas Company but was *524 the job of the Thibodeaux Boiler Works and when, at the request of employees of that company, he undertook to assist them in that particular work he became an eru-ployee of their employer, the Thibodeaux Boiler Works. The Court stated that the principle was identical with that of the Baltimore & O. S. W. R. Company v. Burtch, 263 U.S. 540, 44 S.Ct. 165, 68 L.Ed. 433, and stated [2 So.2d 675]: “We think ■that, similarly here, Spanj a became an -emergency or borrowed employee of the Thibodeaux Company. * * * ”
There is no question of an emergency or borrowed servant in the case at bar. For the present case to be similar to this case, Guillory, the regularly employed welder of the Hunt Tool Company would have had to be requested by Morris and Meredith to turn aside from the duties of his regular employment with the Hunt Tool Company and perform some duty for Morris and Meredith. Then Guillory, while performing these duties for Morris and Meredith, say, for example, in moving a piece of machinery would at that time be the emergency or borrowed employee of Morris and Meredith. For these reasons I do not think this case is applicable to the case at bar.
The case of Duke v. Dixie Bldg. Material Company, supra, was one in which the plaintiff was suing tor damages for personal injuries which resulted while he was in the employ of a contractor and engaged in the laying of concrete foundations, and the driver of a concrete mixer truck belonging to -the defendant which was loaded with ready mixed concrete attempted to back the truck over the curb to the sidewalk and Duke was injured in the. backing process. The defendant as an alternative defense averred that there was no liability for the reason that at the time of the occurrence of the accident the driver of the truck was following the orders of the contractor in pouring the concrete and had become “pro hac vice” an employee of the contractor and thus a fellow servant of Duke, the plaintiff; that he had stepped out of character as cm employee of Dixie Building Material Compcmy, Inc. and had become the borrowed employee of the contractor. This special defense was based upon the fact that the contractor had ordered the ready-mixed concrete to be delivered on the job, and as the concrete was being used as a foundation for a brick wall and was quite long, the contractor found that it expedited his- work to have defendant’s truck, which was delivering the concrete, pour a portion of it at one part of the trench and then move and pour another portion several feet further along in the trench, rather than pouring it ail in one place. It was the theory of the defendants that it was only their obligation to deliver the concrete at one place and that since it was on the orders of the contractor and for his convenience that the driver of the truck was making the delivery in different places and was assisting in pouring the concrete under the orders of the contractor, in doing so he became “pro hac vice” an employee of the contractor. The Court held [23 So.2d 824]: “Here, however, it was the duty of Green, as, an employee of Dixie Building Material Company, to deliver the concrete and anything done by him in connection with that delivery was done as an employee of that company and not as a borrowed employee of the contractor, Moray.- The mere fa.ct that the contractor required Green to divide the load and to make two or more deliveries, each in a different place, did not alter the fact that in doing so the driver was merely delivering something which was being sold 'by his employer. We are aware of the fact that those companies which sell ready mixed concrete have la-rgely increased their business by pointing to the convenience of having the concrete delivered in a ready-mixed condition and in having it poured directly into the hole or form into which it is to set or harden. It would not do to permit it to be said that, although when such a delivery is made and the entire load is poured into one hole or form the delivering driver remains.the employee of the selling company, when the purchaser asks that the delivering truck be moved to two or more points, the driver after the first partial unloading of the truck, becomes the borrowed employee of the contractor merely because he is making the delivery a little more convenient for the contractor.”
*525 Again it would appear to me that this case, insofar as the loaned or borrowed servant doctrine is concerned, is not applicable to the case under consideration. If anything, it supports the contention of the plaintiffs and is against the conclusions reached in the majority opinion. Guillory was engaged by the Hunt Tool Company as a skilled and expert welder to do nothing but welding. During the entire time that he was on the job at the Morris and Meredith drilling rig he did nothing but weld and at the time of the accident he was performing the duties for which he had been employed by the Hunt Tool Company and which were in the furtherance of its business and within the scope of his employment. He had not “stepped out” of character as an employee of the Hunt Tool Company. It was the duty of Guillory as an employee of the Hunt Tool Company to weld anything pointed out to him by Morris and. Meredith, and anything done by Guillory in connection with this welding was done as an employee; of the Hunt Tool Company and not as a borrowed employee of Morris and Meredith, Inc.
In Dixie Machine, Welding and Metal Works v. Boulet, supra, the plaintiff obtained :a contract for the erection of a smoke stack and in order to perform' their contract rented a crane with a sixty foot boom from the defendant. It is shown that the defendant rented out this machine to other persons doing heavy construction work. When the crane was delivered to the plaintiff, the defendant sent an operator for the reason that prior to that time he had been requested by the plaintiff to furnish a competent operator. The boom on the crane wás damaged while being used by the" plaintiff and the plaintiff filed suit to collect the ■ cost of these repairs, whereupon the defendant' reconvened for the charges for the rental of the crane and for the reimbursement of the wages and expenses incurred in connection with the operator. The Court stated [38 So.2d 550]:
“ * * * It is made very clear that in an operation of this kind the foreman or superintendent is in complete charge and that his orders must be obeyed. This foreman in this instance was Berniol, a regular employee of the Dixie Company. It is made clear also that, an operator of a crane, who, in this instance, was Zeagler, has no right to refuse to obey orders of the superintendent except that'if he'believes that the carrying out of the orders will endanger himself, he may refuse to carry them out. * * *
******
“ * * . - * If we are in error in holding that Berniol was entirely at fault and in not finding that Zeagler, too, might have been careless, we do not see that any dif-férent result would be brought about, for, as we view the evidence, it shows that Zeagler, during that entire operation, was the employee of the Dixie Company and was not the employee of Boulet.
“Zeagler was not a regular employee of Boulet * *
Therefore, this case differs from the case under consideration for' Guillory was the regular employee of the Hunt Tool Company and the foreman or superintendent of Morris and Meredith was not in complete charge of the welding and had no right to control the manner, method or details of the work, and the accident and damage in the present case was caused solely and proximately by the fault of Guillory, the regularly employed welder of the Hunt Tool Company and, in my opinion, under the facts, the welder and helper were not hired to nor the equipment rented by Morris and Meredith. It is my opinion that under the terms of the contract and agreement between Morris and Meredith and the Hunt Tool Company and the facts as contained in this record that the Hunt Tool Company was an independent or subcontractor and as such was a third party as referred to in Section '7 of the Compeiisation Act, and could be sued in tort by the plaintiffs herein as the accident and resulting damages were caused by the negligent act of the employee of the independent contractor, Hunt Tool Company, and that plaintiffs are entitled to recovery.
For these reasons, I respectfully dissent.