### JOHNSON et al. v. ROYAL INDEMNITY CO.
### Civ. No. 3427.

United States District Court
W. D. Louisiana, Lake Charles Division.
May 22, 1952.

Carmouche, Martin & Wilson, and Nathan Cormie, all of Lake Charles, La., for plaintiffs.

Stafford & Pitts, Alexandria, La., for defendant.

PORTERIE, District Judge.

After a full trial with verdict by the jury, the cast defendant filed a motion for judgment notwithstanding the verdict of the jury and for a new trial.

At the close of all the evidence in this case the defendant moved for a directed

3. United States ex rel. Mezei v. Shaughnessy, 2 Cir., 195 F.2d 964; 28 U.S.C. § 2243.

verdict. The two principal grounds for the motion raised legal propositions: the first being that the .evidence showed conclusively that Pete James was an independent contractor, and the second being that the evidence likewise showed that the truck was not engaged in any work for W. R. Core at the time of the accident.

The facts are simply these: W. R. Core, a gravel contractor, contracted with the State of Louisiana to furnish it pitrun gravel, to be delivered at a road site, for so much per yard. Core, in turn, made agreements with numerous truckers of the neighborhood to haul the gravel from his pit to the designated place. Core owned the drag line at the pit which loaded the trucks with gravel. The trucks, as they arrived at the pit, would get in line for loading. As one truck driver stated, in order to haul the maximum number of loads per day, it was wise to get to the pit early and work late. No specified number of loads was required, however. When a truck was loaded it proceeded to the road site, where the driver was told by a state inspector where to dump the gravel.

On the ten- to twenty-mile trip in between the loading point and the unloading point and the return trip empty, the truck was totally and solely under the guidance and control of its driver.

The trucker involved in this case was Pete James, who owned his own trucks, bought and paid for his own gasoline and oil, made and paid for all repairs, and hired and paid his own drivers. James agreed to haul gravel from the pit to this particular road job for $1.25 per yard. When a load was delivered the state inspector would give the driver a receipt evidencing delivery of so many yards of gravel. The truck owner, Pete James, presented these tickets to Core as evidence of performance. Core paid James the $1.25 per yard and he (James) paid his own drivers, a price with which Core had nothing to do in fixing or anything else.

The trucks would shuttle from the pit to the road site, a distance averaging some eighteen miles. During that time (and it was the longest time by far of the job), Core had nothing to do with Pete James, his

truck, nor his driver, Kenneth. Pete James was the sole master of his truck, if not directly, then through his nephew, the driver and master for Pete of the truck.

The driver employed by Pete James, owner of the truck, was Kenneth James, a nephew. This nephew was in the Army at the time of trial and the parties agreed to his written statement, as follows:

"Alexandria, La.

"October 10, 1951.

"I live at Cravens, La. When I had an accident on June 9, 1951 I had been employed by my uncle, Pete James, for about a year as a truck driver. I was twenty years of age in August, 1951 and when this accident occurred on June 9, 1951, I had been hauling gravel for W. R. Core on this particular job for about three weeks. I have been driving a 1950 Dodge truck which belongs to my uncle, Pete James. During this three week period which I have referred to all the hauling done by me was for W. R. Core, and the gravel was hauled from what is known as the Burnett pit to about several miles southwest of Sugartown. The gravel was dumped on the highway as was directed by a state inspector, or whoever was in charge at the time.

"The truck was loaded by Core's drag line at the pit. On Saturday, June 9, 1951, we were told about twelve o'clock that the hauling was over for the day. We were told this when we got our last load of gravel. I took this last load from the pit to the job beyond Sugartown and dumped the load.

"It is my practice to take my uncle's truck home with me each night and to keep it over the week-end. It is about eighteen miles from this gravel hauling job to where I live at Cravens, La. After I dumped the last load I proceeded to drive the truck toward my home. It was my intention to come back on the hauling job the following Monday morning.

"The accident occurred on State Highway # 22 about seven miles from.

the place where the gravel was dumped. I was going in a generally northerly or northeasterly direction when the accident happened * * *".

The Louisiana cases which say that from the above facts Pete James is an independent contractor are (a) Beck v. Dubach Lumber Co., Ltd., 171 La. 423, 131 So. 196 (1930-log hauling); then the issue is rehearsed and reaffirmed in (b) Eames v. Alexandria Contracting Co., Inc., La.App., 154 So. 510 (1934-gravel hauling); then this very Court reviewed the issue and compared cases in (c) Alexander v. Frost Lumber Industries, D.C., 88 F.Supp. 516, affirmed on appeal in 5 Cir., 187 F.2d 27 (1950-log hauling).

■ Louisiana builds roads; much gravel hauling is accomplished as in the instant case; it meets and satisfies, as practiced, our particular economy. Louisiana is a timber-producing state; much log hauling is accomplished; it meets, likewise, as practiced, our particular economy. The factual relation involved has consistently made of the hauler, under the necessarily usual facts, an independent contractor. The theory of a borrowed servant, pro hac vice, has never prevailed in our log and gravel hauling business. It does not fit our economy. The facts of the instant case dovetail the facts that have established our jurisprudence for decades. So, definitely, and purely as a matter of law, as there is no conflict on any material fact, Pete James is an independent contractor and the motion for a judgment in favor of defendant notwithstanding the verdict must prevail.

We have read every case cited to us by the plaintiffs. The cases of Dixie Machine, Welding & Metal Works, Inc. v. Boulet, La.App., 38 So.2d 546, and Sadler v. May, La.App., 185 So. 81, are definitely not applicable. The cases of Duke v. Dixie Bldg. Materials Co., La.App., 23 So.2d 822; Spanja v. Thibodaux, La.App., 2 So.2d 668; Cali v. Cloverland, La.App., 21 So.2d 166; Hutto v. Arbour, La.App., 4 So.2d 84; and, Benoit, Holloway and Anchor Casualty Co. v. Hunt Tool Co., La.App., 45 So.2d 512, are clearly and readily distinguishable; the Benoit case, at least, is placed in the twilight zone by a strong and well-reasoned dissenting opinion. The gravel and log hauling cases are immediately distinguishable from all of the above cases; the difference is not arbitrary; it is factual.

Under the instructions of Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147; and, Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498, we must continue in the further consideration of the motion, though we shall sign a judgment dismissing the plaintiffs' case.

We shall pretermit the above point and assume that Pete James was the servant or employee of Core.

It is urged by defendant in its motion for a directed verdict at the end of the whole case, renewed now in the present motion timely filed, "that all gravel hauling operations had ceased around noon on the day of the accident and that the truck driver was not performing any work for Core's benefit at the time of the accident".

Some of the story on this phase is found in the above digest of the facts from the record.

We find the additional uncontroverted facts to be that on the date of the accident giving rise to this suit all gravel hauling operations were terminated around noon, this being on a Saturday. Kenneth James, the driver of the Pete James truck which was involved in the accident, had received and delivered his last load of gravel. When the accident happened it was about 2:30 P.M., and the place of the accident was some seven miles from the place where the driver had completed his work, and the driver was on his way to his (Kenneth's) home, where he intended to keep the truck overnight. Kenneth was not on the way to Pete James'. So he was not on the way to fill his tank with gasoline. He intended to report back to haul gravel on the following Monday morning.

The plaintiffs contend that Kenneth James, the driver of the vehicle, was going to Pete James' place on this Saturday afternoon to put gas into the vehicle for hauling work on Monday morning.

Though meriting the unfavorable criticism of making this ruling too long, we shall add more excerpts from the record:

Robert Fee, another truck driver for Pete James, testified as follows:

"Q. About what time do you think you left the gravel pit with the last load? A. Just not knowing—I imagine I left there around eleven-thirty, but I wouldn't be sure.

"Q. Were there other trucks that left with you? A. Some left ahead of me and I left some there to still be loaded when I left.

"Q. Did a 1949 Dodge truck driven by Kenneth James leave with you? A. It left just behind me.

"Q. How far did you all drive from the pits to the place of dumping the gravel? A. We must have been going back I imagine about seventeen or eighteen miles at the time this happened.

"Q. About what time do you think you got to the dump place? A. I imagine 12:30 or 1:00 o'clock. I didn't have any watch.

"Q. And where did you go after you left the place where you unloaded? A. I went to Pete James'.

"Q. When you left the place where you unloaded, did you notice anybody following you? A. Them other boys, Harley Johnson and Kenneth James. I believe I came ahead of the two trucks of Mr. Deason's. I pulled on and stopped off with Johnnie Johnson. When those boys came along I learned there had been a wreck. I was just ahead of them. The road was awfully dusty.

*       *       *       *       *       *

"Q. Did you pass through the curve where the accident occurred and go over to Mr. Pete James'? A. Yes, sir.

"Q. What did you go there for? A. To gas up the truck.

"Q. Was it customary to gas up at the end of the day? A. Yes, sir.

"Q. At the time you would go there to gas up, would he also repair or do anything to the truck? A. If it needed it, he did. If not, of course, we would go ahead and oil and gas up and go to the house. Some of the boys might have left their trucks there and some of us went home in them.

"A. As far as that, Kenneth was going to his house. He was a single boy and would go around the other road. That's the way is seemed to me. He would go to his house and park and probably eat his supper. A lot of times he didn't carry Mr. James' truck home with him. He would usually go there and get into his car.

*       *       *       *       *       *

"Q. The Judge asked you who put gas in your truck. It was Mr. Pete James that you worked for, wasn't it? *  *  * A. Yes, Mr. Pete James. If he wasn't there we would gas ourselves or his wife would come out and unlock the stand.

"Q. Was it his gasoline and oil? A. Yes, sir.

"Q. And his truck? A. Yes, sir.

"Q. And when there were any repairs on the truck necessary, then Mr. Pete James was the man who either made them or had them made? A. Yes, sir.

"Q. The man who paid you for what you earned was Mr. Pete James? A. Yes, Mr. Pete James was the man who paid me.

*       *       *       *       *       *

"Q. When Core's man told you, 'This is the last load. You can knock off until Monday morning,' or something to that effect, when he said that were you through working? A. I had to carry this load of gravel on and dump it.

"Q. How far did you carry it? A. Probably sixteen or eighteen miles.

"Q. Then you were not through working for the day when he told you that was the last load? A. No, sir."

The one-sided evidence is that Kenneth James, the driver for Pete James, was not going to put gas into the Pete James automobile for work the following Monday. He was going to his own home. Robert

Fee, another driver, says that he (Fee) would do so that day. If he had filled the tank that Saturday, who knows if there would be any left for Monday's work, considering the amusement places to visit Saturday night, the places of worship to attend on Sunday morning, and the social calls to make Sunday evening?[1]

But the plaintiffs contend that under the terms of the public liability policy issued to Core by the defendant it is not necessary for the driver to be acting for the benefit of Core in order for Core, and so defendant, to be liable; and that if the Court concludes that Kenneth James was the borrowed employee of Core, then the policy states that the definition of insured is applicable. The definition of insured under the policy states, "With respect to the insurance for bodily injury liability and for property damage liability the unqualified word, 'insured' includes the named insured and also includes any person while using the automobile and any person or organization legally responsible for the use of the automobile thereof, provided the actual use of the automobile is by the named insured or with his permission."

The language is not applicable to the instant case, for the "automobile" in the instant case is Pete James' automobile—not Core's automobile.

The above provision of law, applied in Louisiana in the case of Parks v. Hall, 189 La. 849, 181 So. 191, and others that followed, is effective, provided it be the assured's automobile. To support this we quote the recital about the case from plaintiffs' own brief:

"Plaintiff sued defendant insurer on a liability policy which contained a clause stating that any person who operated the automobile with the permission of the named assured would enjoy full protection of the policy. The assured instructed chauffeur to use the

car for a specific purpose and return it to assured's residence. The chauffeur after attempting unsuccessfully to perform the errand, used the car for his own purposes, and upon returning negligently caused the collision in which plaintiffs were injured—Held: That the permission to take the automobile accorded to the chauffeur in the first instance, irrespective of the use to which the chauffeur put the car while in his possession was "permission of the Assured" within the meaning and contemplation of the omnibus clause and thus the insurer was liable."

So, the motion of defendant for judgment n. o. v. must prevail again.

Here is an additional part of the contract between Core and his insurer, Royal Indemnity Company, defendant:

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability, for Property Damage Liability and for Medical Payments applies with respect to hired automobiles, subject to the following provisions:

"1. Definitions. The words 'hired automobile' shall mean a land motor vehicle, trailer or semitrailer used under contract in behalf of or loaned to, the named insured provided such automobile is not owned by or registered in the name of (a) the named insured or (b) an executive officer or partner thereof or (c) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile and provided further the following described equipment shall not be deemed an automobile except while towed by or carried on a motor vehicle not so described: any crawler-type tractor, farm implement, ditch or trench digger, power crane or shovel, grader, scraper, roller, well drilling machinery,

---

1. Mr. W. R. Core testified as follows:

"Q. I believe you said you had the same type of agreement with all of these truck drivers. A. They were all getting the same money.

"The Court: Did you have any control over or did it worry you at all where these trucks went every night? The Witness: No, sir.

"The Court: They could go to a night club or a religious meeting the next day or anything of that kind? The Witness: Yes, Sir."

asphalt spreader, concrete mixer and mixing and finishing equipment for highway work, other than a concrete mixer of the mix-in-transit type, and, if not subject to motor vehicle registration, any equipment used principally on premises owned by or rented to the named insured, farm tractor or trailer. The word 'automobile' whenever used in the policy, with respect to the insurance afforded under this endorsement, shall include 'hired automobile.'

"2. Application of insurance. (a) The Definition of insured agreement of the policy applies to the insurance afforded under this endorsement except to the *owner of the automobile or any employee of such owner.*"

If Core had hired automobiles, each at so much per day, had selected the men to drive them (basis for accountability), then, we should say, the "hired car endorsement" would be applicable. Under the instant facts, the endorsement does not enter into the case. Pete James is an independent contractor under the law of Louisiana.

So, again, our duty is to grant the defendant the judgment n. o. v.

■ As we see it, this is the case. The two provisions of the insurance contract which zealous counsel seek to use to recover upon, (a) an omnibus, or extended coverage clause of an automobile liability policy; and, (b) the hired automobile endorsement to the policy, do not enter into the case for there is no legal relation between Royal Indemnity Company and Seaborn Johnson, plaintiff. Pete James is an independent contractor; he insulates Core and, consequently, Royal Indemnity Company, the insurer of Core.

To comply with the instructions of the Montgomery Ward case, supra, fixing our duties under Rule 50(b), Fed.Rules Civ.

Proc. 28 U.S.C.A., the alternative motion for a new trial has to be considered and ruled upon.

When Mitchell Deason, an eye-witness, in a position to see and observe, testified, one felt and knew that here was the truth. One could see that the jury was impressed. He refuted squarely the apparent build-up of the plaintiffs' case and showed clearly the sole cause of the accident and resulting injuries was the negligence of the plaintiff-driver—and no negligence in anyone else.

On the other hand, before this, the jury had seen a small baby boy who breathed with pitiful difficulty, erratically and spasmodically. The baby boy was injured in this accident. To add to the emotional appeal, there was a fine-looking, kindly-disposed, child-doctor to explain it all and he was as interested in his charge as he could be, and it was clearly with unselfishness. One felt like helping him to bring back this unfortunate infant to physical normalcy.

What did the jury do? The infant's father was the driver of the automobile in which he was a passenger. The father was a claimant for a total of $6,280.[2] And, the proof in the record is that the father was injured and really suffered, etc. The jury was convinced by the testimony of Mitchell Deason that the negligence of the infant's father was the sole and proximate cause of the accident. They allowed the father nothing, quite properly, but awarded the infant the sum of $10,000. Absolutely inconsistent: This is pure charity; there is no evidence in the case to warrant the award.

To Mrs. Gertrude Johnson, wife of the driver and passenger in the automobile, the jury awarded the sum of $100, on the request for an award of $8,000. This small sum of $100 is wholly illogical, if the jury

2. Article 13 of the complaint: "In the collision plaintiff, Seaborn Johnson sustained grave and severe head injuries, and has suffered constant headaches since the accident. As a result of these injuries plaintiff, Seaborn Johnson has sustained medical expenses and will sustain medical expenses in the future all of which are estimated in the sum of Eight Hundred ($800.00) Dollars."

Article 15 of the complaint: "Plaintiff, Seaborn Johnson, is entitled to recover as a result of his injuries, pain and suffering, loss of earnings, loss of future earnings and disability, the sum of Five Thousand Four Hundred Eighty ($5,480.-00) Dollars."

thought the James vehicle to be at all in the wrong. The jury was subjected to tremendous emotional pressure by the exhibition of the paralyzed baby boy. It knew that the father of the baby, the driver of the offending car, was the author of the negligence that was the sole and proximate cause of the accident. But, in their sympathy, they tipped the mother with the $100.

 So, in case we are wrong in our successive rulings up to here, the motion for a new trial should be granted.

We will sign a judgment, upon presentation, in favor of the defendant, notwithstanding the verdict of the jury.